IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:12-CT-3064-FL


DOUGLAS GENE WHITFIELD,     )
                       )
       Plaintiff,      )
                       )
     v.           )          ORDER
                       )
CRAVEN CORRECTIONAL      )
INSTITUTION, LARRY DAIL,     )
OFFICER COLLINS, STEPHEN    )
JACOBS, TAMMIE STOCKS,     )
HOPE MANNING, ERIC BORDEN,  )
KENNETH WOODY,         )
DR. JAMES D. ENGLEMAN, and   )
JOSEPH DEMATTY,[1]        )
                       )
      Defendants.     )


This matter comes before the court on defendants' respective motions for summary judgment (DE 102, 112) pursuant to Federal Rule of Civil Procedure 56. The matter also is before the court for an initial review pursuant to 28 U.S.C. § 1915(e)(2)(B). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants defendants' respective motions for summary judgment and dismisses plaintiff's remaining claims without prejudice pursuant to § 1915(e)(2)(B).

---

[1] Defendants Manning, Borden, Woody, DeMatty, Jacobs, and Stocks state their full names in their motion for summary judgment. The Clerk of Court is DIRECTED to update the caption in this case to reflect the changes.

## STATEMENT OF THE CASE

On March 13, 2012, plaintiff filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983, against defendants Officer Collins ("Collins"), Larry Dail ("Dail"), Officer Jacobs ("Jacobs"), Officer Stocks ("Stocks"), and Craven Correctional Institution ("Craven"). Plaintiff subsequently filed several documents and letters, including a motion to amend his complaint. On October 16, 2012, the court entered an order granting plaintiff's motion to amend, but directed plaintiff to particularize his action by filing one amended complaint.

Plaintiff subsequently complied with the court's October 16, 2012, order and submitted an amended pleading on October 25, 2012. In his amended pleading, plaintiff expressed an intent to incorporate his prior filings, miscellaneous documents, and numerous letters as part of his amended pleading. On February 8, 2013, the court entered an order and denied plaintiff's request to incorporate his previous filings into his amended pleading, and limited plaintiff's allegations to those contained in his October 25, 2012, amended pleading. The court also conducted a frivolity review of plaintiff's amended complaint pursuant to 28 U.S.C. § 1915(e)(2)(B).

Based on such review, the court allowed plaintiff to proceed with his claim alleging that defendants Hope Manning ("Manning"), Eric Borden ("Borden"), Kenneth Woody ("Woody"), Dr. James D. Engleman ("Engleman"), and Joseph Dematty ("Dematty"), acted with deliberate indifference to his serious medical needs in violation of the Fourteenth Amendment to the United States Constitution. In addition, the court noted plaintiff's attempt to include new claims against defendants Dail, Jacobs, and Stocks, arising in May and August 2012, and that such claims appeared to arise subsequent to plaintiff's filing of the initial action. Consequently, the court directed plaintiff

2

to notify it whether plaintiff exhausted his administrative remedies, pursuant to 42 U.S.C. § 1997e(a), for these new claims within 14 days of its February 8, 2013, order.

On March 22, 2013, defendants Borden, Collins, Dail, DeMatty, Jacobs, Manning, Stocks, and Woody filed a motion to dismiss arguing that plaintiff failed to state a claim upon which relief may be granted. Then, on April 5, 2013, plaintiff filed a motion to voluntarily dismiss defendant Collins from this action.

On May 3, 2013, defendant Engleman filed a motion to dismiss arguing that plaintiff failed to properly obtain service and that plaintiff failed to state a claim upon which relief may be granted, which was fully briefed. As part of his response to Engleman's motion, plaintiff submitted a copy of a "comprehensive metabolic profile" report dated May 1, 2013. (DE 62.) Plaintiff subsequently filed a motion to amend his complaint to include additional allegations against Engleman, to which plaintiff attached a May 23, 2013, laboratory test report for plaintiff's testosterone and thyroid. (DE 63.) The motion also was fully briefed.

On December 20, 2013, the court entered an order granting plaintiff's motion to amend and motion to voluntarily dismiss Collins from this action without prejudice. The court also granted in part and denied in part Engleman's motion to dismiss. The court granted Engleman's motion as to Engleman's challenge to service of process and quashed service as to Engleman.[2] The court denied the remainder of Engleman's motion to dismiss. The court also denied the motion to dismiss filed by defendants Borden, Dail, DeMatty, Jacobs, Manning, Stocks, and Woody.[3] Finally, the court

---

[2] On December 27, 2013, counsel for defendant Engleman informed the court that he had authority to accept service of process on behalf of Engleman. Counsel was served on the same date. See (DE 67, 68.)

[3] The court declined to consider the exhaustion issue to allow defendants Dail, Jacobs, and Stocks to file the appropriate motion raising the affirmative defense.

dismissed plaintiff's action against defendant Craven pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii).

On January 9, 2014, defendant Engleman filed a second motion to dismiss, arguing that plaintiff failed to state an Eighth Amendment claim against him. The motion was fully briefed. On July 31, 2014, plaintiff submitted a copy of the results from an April 22, 2014, magnetic resonance imaging ("MRI") test of his right knee. See ((DE 99), Attach.) On August 20, 2014, the court granted in part and denied in part Engleman's motion to dismiss. The court granted Engelman's motion as to his request for injunctive relief due to the fact that plaintiff no longer was at the facility where Engleman treated plaintiff. The court denied the remainder of Engleman's motion to dismiss.

Defendant Engleman, as well as defendants Borden, Dail, DeMatty, Jacobs, Manning, Stocks, and Woody, filed the instant two motions for summary arguing that plaintiff is unable to establish a constitutional violation. Alternatively, defendants assert the affirmative defense of qualified immunity. The motions were fully briefed.[4]

## STATEMENT OF UNDISPUTED FACTS

Plaintiff primarily raises claims arising out of alleged deliberate indifference to his serious medical needs by defendants Manning, Borden, Woody, and DeMatty on August 28, 2011, and out of defendant Engleman's alleged deliberate indifference to his medical needs. The court sets forth the facts related to these two claims in turn below.

---

[4] Plaintiff suggests in his response to defendants' motion for summary judgment that he was not provided the opportunity to conduct discovery in this case. However, on April 29, 2014, the court entered a case management order providing the parties the opportunity to conduct discovery. Additionally, defendant Engleman attached plaintiff's voluminous medical records to his motion for summary judgment. Accordingly, the record reflects that plaintiff was, in fact, allowed the opportunity to conduct discovery and that plaintiff has not alleged that there are any particular discovery materials he needs in order to respond to defendants motion for summary judgment. Thus, the court finds no reason to delay ruling on the pending motions for summary judgment. See Fed. R. Civ. P. 56(d); Crawford-El v. Britton, 523 U.S. 574, 599 n.20 (1998) (quotation omitted) (noting that a judge may postpone ruling on a motion for summary judgment if the nonmoving party requires discovery to identify "facts essential to justify the party's opposition.")

Beginning with the facts related to the August 28, 2011, incident, plaintiff, then a safekeeper[5] in the custody of the North Carolina Department of of Public Safety ("DPS"), was housed at Craven Correctional Institution[6] ("Craven") when hurricane Irene impacted the area. (Dail Aff. ¶¶ 4, 8.) During the storm, the roads to Craven became flooded making travel to and from the facility difficult. (Id. ¶ 10.) The storm also caused Craven to lose power, which resulted in prison officials operating the facility largely without electricity. (Id.) Accordingly, much of the inmate supervision on August 28, 2011, was done manually by correctional staff without the assistance of camera monitoring systems or other electronics. (Id. ¶ 11. ) Although staff were able to utilize a back-up generator to operate necessary control and nursing stations, as well as to provide emergency-only power systems (i.e. hallway lighting and exit signs), it did not have the capability to provide power to the entire facility or to all inmate cells. (Id.) Craven faced further challenges on that date due to the fact that DPS re-directed staff from Craven to assist with evacuating 600 inmates from Pamlico Correctional Institution. (Id.)

There was no power available in plaintiff's entire housing block due to the storm-related power outage on the date at issue. (Id. ¶ 18.) As a result, plaintiff was not able to operate his continuous positive airway pressure ("C-PAP") machine.[7] (Id. Attach. p. 20.) At approximately 9:00 p.m., plaintiff began having trouble breathing and "filed a medical emer[gency.]" (Id. Attach.

---

[5] The term "safekeeper" refers to an inmate who has not yet been sentenced, but is housed for "safekeeping" in DPS custody rather than at a local county jail. (Dail Aff. ¶ 13.)

[6] Craven is located in Vanceboro, North Carolina. (Dail Aff. ¶ 7.)

[7] A C-PAP machine is a device which assists users who suffer from sleep apnea in breathing while sleeping. (Def.s' Mem. (DE 103), p. 3.)

5

p. 15.) At approximately 10:30 p.m., plaintiff passed out and hit his head, causing a knot. (<u>Id.</u>) Plaintiff was not transported to the medical department that evening. (<u>Id.</u>)

At 6:30 a.m., plaintiff filed another medical emergency (<u>Id.</u>) Defendant DeMatty then investigated plaintiff's complaint regarding plaintiff's C-PAP machine, and was informed by medical staff that there were no working power outlets in plaintiff's cell block to accommodate his C-PAP machine due to the hurricane-related power outage. (<u>Id.</u> Attach. p. 19.) (<u>Id.</u>) Plaintiff was escorted to the medical department the next morning and was moved to a cell which could accommodate his C-PAP machine. (<u>Id.</u> Attach. pp. 19, 34.)

Later on August 29, 2011, plaintiff sent defendant Dail a letter complaining about the incident. (<u>Id.</u> Attach. p. 15.) Dail then investigated plaintiff's complaint and responded to plaintiff that "the delay until the morning shift seeing [plaintiff] in medical was a result of the power outage due to hurricane Irene." (<u>Id.</u> p. 16.)

The court now turns to the facts surrounding defendant Engleman's treatment of plaintiff at Craven from April 16, 2010, through January 22, 2013. (Engleman Aff. ¶ 4 and Ex. 2.) By way of background, plaintiff was diagnosed with high blood pressure, chronic obstructive pulmonary disease ("COPD"), and degenerative arthritis before his incarceration at Craven. (<u>Id.</u> ¶ 7 and Ex. 3.) Plaintiff was prescribed Oxycodone-APAP (a generic version of Percocet, an opioid pain medication) on a regular basis, dating back to October 2008, for his degenerative arthritis. (<u>Id.</u>) In addition to Oxycodone, plaintiff was prescribed Hydrocodone BT-Ibuprofen (a generic version of Vicoprofen, an opioid pain medication), Hydrocodone-APAP 5/500 mg (a generic version of Vicodin, an opioid pain medication), and Acetaminophen-Codeine (Tylenol with Codeine, an opioid pain medication) for pain management. (<u>Id.</u>) Further, for treatment of plaintiff's COPD diagnosis,

6

plaintiff had been prescribed Tussionex Pennkinetic, an antihistamine and cough suppressant which contains Hydrocodone, an opioid pain medication (hereinafter "Tussionex"). (Id. and Ex. 3.)

On April 16, 2010, Nurse K. Dauberman ("Dauberman") conducted a health screening of plaintiff upon plaintiff's arrival at Craven, and noted that plaintiff was being treated for arthritis. (Id. ¶ 8 and Ex. 4.) During the screening, Dauberman advised plaintiff to submit a sick call appointment request to address plaintiff's complaints of a swollen knee.[8] (Id.) Dauberman also reviewed plaintiff's medical administration record from Nash County[9] and noted that plaintiff was taking Robaxin (muscle relaxant) and Ultram (a narcotic-like pain medication). (Id.)

Two days later, a nurse evaluated plaintiff in response to plaintiff's complaint of left knee pain and swelling. (Id. ¶ 9 and Ex. 5.) In the course of examining plaintiff, the nurse noted plaintiff was wearing a brace on his left knee and that his left knee was slightly swollen, red and warm to the touch. (Id.) Plaintiff advised the nurse that he had arthritis in both knees. (Id.) The nurse referred plaintiff to the camp physician for further evaluation. (Id.)

Defendant Engleman examined plaintiff for the first time on April 19, 2010. (Id. ¶ 10 and Ex. 6.) Engleman noted that plaintiff's blood pressure and pulse were within normal limits. (Id.) Engleman further noted that plaintiff had a prosthetic testes and tenderness effusing from the patellar tendon which caused pain with range of motion. (Id.) Engleman rated plaintiff's physical

---

[8] In order to obtain an appointment in the medical clinic in a North Carolina Department of Public Safety facility without a regularly scheduled follow-up appointment, an inmate first must submit a sick call appointment request with his complaints, which is then reviewed by a triage nurse who schedules a time for the sick call appointment with a nurse. At the appointment, the nurse assesses the inmate and records his complaints, as well as the nurse's observations, assessments and plan. The nurse determines at the appointment whether the inmate is to be seen by another healthcare provider, and makes such referrals, if necessary. An inmate is not scheduled for an appointment with the physician unless he is referred by the nurse, nor is the inmate's chart submitted for review by the physician unless the nurse refers the chart for review. (Engleman Aff. ¶ 6.)

[9] Plaintiff also was held as a safekeeper in Nash County while he was awaiting judgment and sentencing. (Engleman Aff. ¶ 8, n.4.)

capability "minimal disease," due to chronic arthritis, and assessed plaintiff's upper extremities as normal and his lower extremities with moderate functional loss. (Id.) Based upon his physical examination of plaintiff, Engleman determined that continued treatment with opioid and/or narcotic pain medication was not necessary. (Id.) Engleman, instead, determined that plaintiff's pain complaints could be controlled with non-narcotic medication that reduced his inflamation, thereby reducing his pain. (Id.) As a result, Engleman discontinued plaintiff's prescriptions for Robaxin and Ultram, and instead ordered Toradol (a short-term non-steroidal anti-inflammatory drug) and Elavil. (Id.) Engleman also directed that plaintiff be placed on activity restriction, be permitted to use a cane, and be assigned a bottom bunk. (Id.)

Following his April 19, 2010, appointment with Engleman, plaintiff submitted sick call requests on a regular basis complaining about pain. (Id. ¶¶ 13-19, 25, 26, 32 and Exs. 6, 8, 9-12, 24). Plaintiff was evaluated by a nurse each time he submitted a sick call request, and plaintiff's complaints often were referred to defendant Engleman for evaluation. (Id.) Plaintiff's medical records reflect that Engleman adjusted plaintiff's pain medications on several occasions in response to plaintiff's complaints of pain. (Id. ¶¶ 19, 29, 31, 33 and Exs. 11, 22, 23.) Engleman also ordered that plaintiff be provided a knee brace on August 25, 2010. (Id. ¶ 25 and Ex. 15.)

On October 14, 2010, plaintiff filed a grievance alleging that the medications he received prior to his incarceration were being unlawfully withheld and that the substituted medications were ineffective. (Id. ¶ 35 and Ex. 26.) Upon reviewing the grievance, Engleman completed a "Statement by Witness" form to aid in the grievance resolution process in which Engleman provided the following response:

> There is no state or federal law which compels a physician to prescribe a medication on the basis that [it] was previously prescribed

8

by another physician. In regards to opiates there are in fact no medical conditions for which opiates are the required treatment.

The 3 page record from Nash Internal Medicine was reviewed along with records from the NC Controlled substance DHA Bank and information discovered was in fact alarming.

The record showed a steady increase in narcotic (opiate) usage to a level that could only be considered excessive for a medical condition normally treated with narcotics and in my twenty five year experience never in the amounts received as the primary agent for pain relief.

Even more troubling was that in addition to receiving the maximum amount of short acting oxycodone [], he also for nearly a year was receiving Tussionex . . . . Tussionex is only FDA approved for short form (1-2 wks) use, is specifically not recommended to be using (sic) in patient with respiratory conditions (COPD/Sleep Apnea) and not in conjunction with other narcotics[.] [I]n fact the FDA issued a special "May Result in Patient Death" warning for Tussionex in 2009.
I will see the patient in follow up in approximately one week to consider more accepted and well researched treatment approaches to his condition.

(Id. Ex. 26.)

Following the resolution of plaintiff's grievance, defendant Engleman evaluated plaintiff on October 27, 2010. (Id. ¶ 36 and Exs. 27, 31.) Plaintiff told defendant Engleman the pain started in his knees five years prior to the date of his appointment, and then spread to plaintiff's lower back, arms, and legs. (Id.) Plaintiff informed Engleman that he was previously diagnosed with degenerative joint disease. (Id.) Engleman observed that plaintiff moved and spoke with ease, and exhibited good range of motion in his upper extremities. (Id.) Engleman further noted that plaintiff's range of motion in his hips and knees also was okay, but noted plaintiff did have some pain with full flexion. (Id.) Based upon his examination of plaintiff, Engleman noted that plaintiff's condition was far more benign than plaintiff's complaints suggested. (Id.) Defendant Engleman

9

ordered the following: (1) radiological studies of plaintiff's pelvis and right knee; (2) laboratory testing; and (3) Prednisone taper (a steroid treatment used as a long term control of inflamation).[10] (Id.) Engleman also instructed plaintiff to return for a two-week follow-up appointment. (Id.)

Plaintiff's electromagnetic radiation ("x-ray") test results revealed that plaintiff's knee was in alignment, but that there was a narrowing of the joint space due to mild degenerative changes. (Id. ¶ 37 and Ex. 27.) Plaintiff's x-rays also revealed mild degenerative spurring involving plaintiff's tibial spine and femoral condyles, with no evidence of fracture or effusion. (Id.) Based upon the x-ray results, the radiologist concluded that plaintiff had mild osteoarthritis of the right knee. (Id.) The radiological study performed on plaintiff's pelvis was unremarkable. (Id.)

Following plaintiff's October 27, 2010, examination, plaintiff continued to file regular sick call requests relating to his complaints of pain. (Id. ¶¶ 39, 41, 45, 47, 49, 50, 52, 55, 65 and Exs. 29, 31-35, 37-39, 41, 42, 46.) Defendant engleman continued to alter plaintiff's prescribed medications in response to plaintiff's complaints. (Id. ¶ 48 and Exs. 30, 40.) Plaintiff also continued to request treatment with narcotic pain medications. (Id. ¶ 51 and Ex. 40.) In response, Engleman explained to plaintiff that there was no evidence to support plaintiff's reported level of pain. (Id.)

In January 2011, defendant Engleman submitted a utilization review board ("URB") request for a rheumatology consultation. (Id. ¶ 51 and Ex. 38.) On February 23, 2011, the URB denied Engleman's request on the grounds that there was no indication that a radiological study was necessary. (Id. ¶ 62 and Ex. 40.) Engleman subsequently continued to evaluate plaintiff's chronic pain and to adjust plaintiff's medications in response to plaintiff's complaints. (Id. ¶¶ 65, 66, 79, 81, 91, 96 and Exs. 45, 54, 58, 60, 68, 72.) On August 17, 2011, Engleman administered an injection

---

[10] Defendant Engleman also discontinued plaintiff's previously prescribed Indocin prescription. (Id.)

of Depo-Medrol (long acting anti-inflammatory corticosteroid) to plaintiff's right knee. (Id. ¶ 96 and Ex. 72, p. 1.) The next day, Engleman submitted a URB request asking that plaintiff be prescribed Neurontin. (Id. and Ex. 72, p. 2.) The URB denied Engleman's request. (Id. Ex. 72, pp. 3-4.) Engleman thereafter continued to treat plaintiff's knee pain, and, at one point, plaintiff informed medical staff that he did not want anymore pain medication. (Id. ¶ 130, and Ex. 92.)

In addition to the above-stated facts concerning defendant Engleman's treatment of plaintiff's chronic pain, the court sets forth the facts pertinent to the treatment of plaintiff's cholesterol and testosterone or thyroid deficiencies. On December 6, 2010, defendant Engleman examined plaintiff in response to plaintiff's complaints of chest pains. (Id. ¶ 43 and Exs. 32, 33.) Plaintiff informed Engleman that he experienced shortness of breath and chest pain after having an argument with his wife. (Id.) An electrocardiogram ("EKG") test performed on plaintiff revealed that plaintiff had sinus bradycardia (a heart rate of less than 60 beats per minute), but otherwise was normal. (Id. Exs. 30, 32, 33.) Engleman ordered a lipid panel, which revealed that plaintiff's triglycerides level was slightly elevated at 152 mg/dL (normal range is 0-149 mg/dL), his HDL cholesterol level was slightly low at 36 mg/dL (normal level is >39 mg/dL), and his LDL cholesterol was elevated at 123 mg/dL (normal range is 0-99 mg/dL). (Id. n.26 and Ex. 30.) Then, on February 22, 2011, Engleman examined plaintiff in response to plaintiff's complaint of a headache plaintiff attributed to high blood pressure. (Id. ¶ 61, and Ex. 42.) Plaintiff's blood pressure test result was normal, but Engleman prescribed Calan SR (used to treat hypertension) in an abundance of caution. (Id.) Engleman continued to monitor plaintiff's blood pressure. (Id. ¶¶ 75, 119 and Exs. 54, 86.)

On September 6, 2011, defendant Engleman examined plaintiff in response to plaintiff's complaints of lethargy. (Id. ¶ 101 and Ex. 76.) Engleman ordered that plaintiff undergo laboratory work to check his complete blood count ("CBC"), his complete metabolic panel ("CMP"), and thyroid stimulating hormone ("TSH"). (Id.) Plaintiff's laboratory test results were within normal limits. (Id. ¶ 102 and Ex. 76.)

On December 20, 2011, Engleman reviewed the results from a December 16, 2011, CBC, CMP, urinalysis, and lipid panel. (Id. ¶ 121 and Ex. 88.) The results of plaintiff's CMP showed that his creatine serum level was only slightly lower than normal and his BUN/creatine ration was only slightly elevated, which Engleman determined was unremarkable and did not require medical intervention. The results of plaintiff's urinalysis showed that the appearance of plaintiff's urine was abnormal (his urine was turbid) and his white blood count was elevated. (Id.) The lipid panel revealed that plaintiff's total cholesterol and LDL cholesterol level were mildly elevated (but not at a level that Engleman determined required treatment with medication) and that plaintiff's HDL cholesterol was low. (Id.)

On September 21, 2012, Engleman reviewed plaintiff's chart and ordered CBC and CMP laboratory tests. (Id. ¶ 153 and Ex. 103.) On September 28, 2012, Engleman reviewed the results of plaintiff's tests, noting that plaintiff's creatine serum and platelet levels were slightly lower than normal, and his glucose serum and BUN/creatine ratio were slightly elevated, which were unremarkable and did not require intervention. (Id.)

**DISCUSSION**

A.      Review Pursuant to 28 U.S.C. § 1915(e)(2)(B)

The Prison Litigation Reform Act directs the court to dismiss a prisoner's complaint *sua sponte* at any time "if the court determines that . . . the action . . . is frivolous . . . [or] fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(i)(ii). A complaint is found frivolous because of either legal or factual deficiencies. First a complaint is frivolous where "it lacks an arguable basis . . . in law." Neitzke v. Williams, 490 U.S. 319, 325 (1989). Legally frivolous claims are based on an "indisputably meritless legal theory" and include "claims of infringement of a legal interest which clearly does not exist." Adams v. Rice, 40 F.3d 72, 74 (4th Cir.1994) (quoting Neitzke, 490 U.S. at 327). Under this standard, complaints may be dismissed for failure to state a claim cognizable in law, although frivolity is a more lenient standard than that for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Neitzke, 490 U.S. at 328. Second, a complaint may be frivolous where it "lacks an arguable basis ... in fact." Id. at 325. Section 1915 permits federal courts "to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." See Denton v. Hernandez, 504 U.S. 25, 32 (1992) (citing Neitzke, 490 U.S. at 327).

Plaintiff, in his amended complaint, alleges claims against defendants Jacobs, Dail, and Stocks arising in May 2012 and on August 6, 2012. The court begins with plaintiff's claim arising in May 2012. Specifically, plaintiff asserts he was "forced to sit in a hard chair 6 ½ per day by staff [] Stocks, [] Jacobs, [] Dail [from May 2012] till August 2012." (Am. Compl. (DE 36), p. 5.) Plaintiff states that he informed these defendants that he had arthritis and "the pain that came from being forced to sit for such a long time fram[e]." (Id.) Plaintiff further informed defendants that "a

13

patient that suffers from this disease must move around not be forced to sit still for hours." (Id.) Plaintiff states that the resulting pain caused him to experience depression. Plaintiff states that defendants Dail, Stocks, Jacobs, and Engleman engaged in such conduct to "punish plaintiff for filing grievances." ((DE 89), p. 2.)

"To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Additionally, a plaintiff must allege the personal involvement of a defendant. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92 (1978).

In this case, plaintiff provided insufficient factual detail to evaluate his claim. For instance, plaintiff has not described the circumstances requiring him to sit for over six hours per day. Plaintiff additionally has not stated how each defendant was involved in the alleged constitutional violation. To the extent plaintiff alleges a retaliation claim based upon the alleged conduct, such claim fails because inmates do not have a constitutional right to a grievance process. See Daye v. Rubenstein, 417 F. App'x 317, 319 (4th Cir. 2011). Finally, as initially noted by this court in its February 8, 2013, order, it was virtually impossible for plaintiff to exhaust his administrative remedies for this claim arising in May 2012, prior to the filing of this action on March 13, 2012. Based upon the foregoing, the court DISMISSES this claim without prejudice.

The court now turns to plaintiff's claims arising on August 6, 2012. Specifically, plaintiff states that defendant Stocks verbally harassed him on August 6, 2012, and that plaintiff wrote a letter to Robert Lewis requesting assistance. Later that day, Jacobs called plaintiff into his office, where defendant Stocks was present. The officers verbally "fussed" at plaintiff and fired him from his job

in retaliation for requesting assistance from Lewis.  See (DE 36, p. 6.)  Plaintiff then informed Dail about the incident, and Dail fired plaintiff from his prison job for not having a GED.  Stocks subsequently replaced plaintiff with another inmate who did not have a GED.

The court begins with plaintiff's contention that defendants Jacobs and Stocks verbally "fussed" at him.  The law is clear that "[m]ere threatening language and gestures of a custodial officer, even if true, do not amount to a constitutional violation."  Morrison v. Martin, 755 F. Supp. 683, 687 (E.D.N.C. 1990) (internal quotation omitted)), aff'd, 917 F.2d 1302 (4th Cir. 1990); see also, Harris v. Green, No. DKC-12-434, 2013 WL 718868, at *4 (D. Md. Feb. 26, 2013) (finding verbal abuse of pretrial detainee did not constitute a constitutional violation).  Because plaintiff's complaint is limited to allegations of verbal abuse alone and because he does not allege that he suffered any injury as a result of the alleged verbal harassment or threatening language, plaintiff failed to state a claim pursuant to § 1983.

To the extent plaintiff alleges that defendants Jacobs, Stocks, and Dail violated his rights pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution when they terminated him from his prison job, such claim fails because the loss of a prison job does not implicate a constitutionally protected liberty interest.  See O'Bar v. Pinion, 953 F.2d 74, 85-86 (4th Cir.1991) (removing inmate from work release program did not violate his constitutional rights); see also, Bliss v. United States Attorney General, No. 8:07-160-TLW-BHH, 2009 WL 3105257, at *5 (D.S.C. Sept. 23, 2009) (finding no due process protections where inmate lost only his job and telephone privileges).  Plaintiff, additionally, failed to allege a discriminatory  motive in the decision to terminate him form his prison job in order to state a violation of the Fourteenth Amendment's Equal Protection Clause.  See Castaneda v. Partida, 430 U.S. 482, 493 (1977); Backus

15

v. Ward, No. 98-6331, 1998 WL 372377, at *1 (4th Cir. June 8, 1998). Thus, these claim are DISMISSED without prejudice.

Finally, the court addresses plaintiff's contention that he was terminated from his prison job in retaliation for complaining about Stocks' conduct to Lewis. To state a retaliation claim, the alleged retaliatory action must have been taken with regard to the exercise of some constitutionally protected right, or the retaliatory action itself must violate such a right. Adams, 40 F.3d at 75. Further, a plaintiff must show that the conduct complained of adversely affected his constitutional rights. ACLU v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993). Moreover, the plaintiff must allege specific facts supporting the claim of retaliation, and conclusory allegations are insufficient to state a retaliation claim. Adams, 40 F.3d at 74-75.

Here, plaintiff's complaint to Lewis essentially constituted a grievance, and inmates do not have a constitutional right of access to the grievance process. Id. at 75. Next, plaintiff failed to demonstrate that the conduct of defendants Dail, Stocks, or Jacobs adversely affected his constitutional rights because inmates do not have a constitutional right to a job while incarcerated. Rhodes v. Chapman, 452 U.S. 337, 348 (1981). Thus, plaintiff failed to state a relation claim, and this claim is DISMISSED without prejudice.

B.      Motion for Summary Judgment

    1.      Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

      2.     Analysis

Defendants raise the affirmative defense of qualified immunity in this § 1983 action. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The court first determines whether plaintiff alleged a constitutional violation.

      a.     Defendants Manning, Borden, Woody, DeMatty

Plaintiff contends that defendants Manning, Borden, Woody, and DeMatty intentionally withheld power to his C-PAP machine and delayed taking plaintiff to Craven's medical department after plaintiff experienced a fall in his cell. As a pretrial detainee, plaintiff has a due process right against conditions that amount to punishment. Bell v. Wolfish, 441 U.S. 520, 535-38 (1979). To establish that a condition or restriction of confinement is constitutionally impermissible "punishment," a pretrial detainee must show "either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which

case an intent to punish may be inferred." Martin v. Gentile, 849 F.2d 863, 870 (4th Cir.1988) (citing Bell, 441 U.S. at 538–40). Prohibited punishments include those which "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428 U.S. 153 (1976)).

As a practical matter, the analysis under the due process clause and the analysis under the Eighth Amendment is materially indistinguishable. See, e.g., Riley v. Dorton, 115 F.3d 1159, 1166–67 (4th Cir. 1997) (en banc), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam). "In order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir.1993) (internal quotation omitted)). The first prong is an objective one—the prisoner must show that "the deprivation of [a] basic human need was *objectively* sufficiently serious"—and the second prong is subjective—the prisoner must show that "*subjectively* the officials act[ed] with a sufficiently culpable state of mind." See Strickler, 989 F.2d at 1379 (internal quotations omitted).

The court assumes for the purpose of the motion for summary judgment that plaintiff is able to satisfy the objective prong of the Eighth Amendment test and, instead, focuses on the subjective prong – whether defendants Manning, Borden, Woody, and DeMatty acted with deliberate indifference. "Deliberate indifference entails something more than mere negligence, ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See Farmer v. Brennan, 511 U.S. 825, 835 (1994). It requires that

a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir.1995).

In this case, the record reflects that Craven was operating under exigent and emergency circumstances on the date at issue due to the landfall of hurricane Irene. The record further reflects that staff reported and responded to plaintiff's concerns regarding the lack of power to plaintiff's C-PAP machine. Due to the fact that the entire facility was without power and operating on a limited basis with back up generators, there was a short delay in providing plaintiff access to power for his C-PAP machine and medical care for the bump on his head. There is no evidence in the record reflecting that any defendant actually knew of and disregard an objectively serious medical need. Rather, the record reflects that defendants responded reasonably under the emergency circumstances. Thus, plaintiff also is unable to establish the subjective prong of the Eighth Amendment test. Because plaintiff is unable to establish either prong of the Eighth Amendment test, defendants Manning, Borden, Woody, are DeMatty are entitled to qualified immunity for this claim.

b.      Defendant Engleman

Plaintiff contends that Engleman refused to treat his chronic pain, thyroid deficiency, testosterone deficiency, and high cholesterol in violation of the Eighth Amendment. As stated, in order to establish an Eighth Amendment violation, a plaintiff must show both "(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler, 989 F.2d at 1379 (internal quotation omitted).

The court assumes, without deciding, that plaintiff is able to satisfy the objective prong of the Eighth Amendment test with respect to his Eighth Amendment claim against Engleman. The court instead focuses on the subjective prong of the Eighth Amendment test–whether Engleman

19

acted with deliberate indifference to plaintiff's serious medical needs. Deliberate indifference "sets a particularly high bar to recovery." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). As stated, "deliberate indifference entails something more than negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See Farmer, 511 U.S. at 835. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka, 71 F.3d at 166. An inmate is not entitled to choose his course of treatment. See Russell v. Sheffer, 528 F.2d 318, 318-19 (4th Cir. 1975) (per curiam). Likewise, mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. Estelle, 429 U.S. at 105-106; Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998). The court now will address plaintiff's Eighth Amendment claims against Engleman in turn.

The court begins with plaintiff's allegation that Engleman acted with deliberate indifference to plaintiff's complaints of pain. The record, in this case, reflects that each time plaintiff filed sick call requests complaining about pain, either defendant Engleman or a nurse responded to plaintiff's complaints. In particular, between the dates of April 16, 2010, and January 22, 2013, a nurse reviewed or examined plaintiff in response to 38 sick call requests. (Id. ¶ 170.) Further, defendant Engleman personally reviewed plaintiff's chart and/or laboratory results on at least 44 occasions, and examined plaintiff on 19 occasions. (Id.) The record further reflects that plaintiff refused medications on 30 occasions. (Id.) Plaintiff has provided no no evidence to suggest that defendant Engleman intentionally disregarded a serious medical need.

As for plaintiff's repeated requests for narcotic pain medication, such requests amount to nothing more than a disagreement over the proper course of treatment, which is insufficient to

establish a § 1983 claim. <u>See e.g.</u>, <u>Russell</u>, 528 F.2d at 319. Additionally, plaintiff's complaint that defendant Engleman's efforts in diagnosing and treating plaintiff's medical needs were not effective does not give rise to a constitutional violation. <u>See</u> <u>Williams v. Branker</u>, 462 F. App'x 348, 354 (4th Cir. 2012) ("Williams points to no authority for the proposition that the Eighth Amendment entitles him to 'effective' treatment."); <u>see e.g.</u>, <u>Russell</u>, 528 F.2d at 319. At most, these defendant Engleman's conduct could be construed as negligence, which is not sufficient to state a constitutional violation. <u>See</u> <u>Estelle</u>, 429 U.S. at 105-106. Thus, plaintiff failed to state an Eighth Amendment claim in relation to his pain management.

Regarding plaintiff's contention that defendant Engleman acted with deliberate indifference to plaintiff's alleged "very high cholesterol" or his alleged thyroid and/or testosterone deficiency, plaintiff's medical records belie plaintiff's assertions. In particular, plaintiff's medical records reflect that defendant Engleman routinely monitored plaintiff's medical conditions and conducted diagnostic testing and monitoring for both his cholesterol and thyroid levels, and provided treatment when Engleman determined treatment was necessary. Engleman further concluded that plaintiff's one remaining testicle provided sufficient testosterone, and plaintiff's his disagreement with Engleman's finding is insufficient to state a constitutional claim. <u>See</u> <u>Russell</u>, 528 F.2d at 319. Plaintiff's May 2013 test results do not alter the court's conclusion in that the laboratory tests were taken several months after Engleman stopped treating plaintiff on January 22, 2013, and, as stated, the record reflects that Engleman monitored these conditions and provided treatment when Engleman determined treatment was necessary.[11] ((DE 62, 63); Engleman Aff. ¶ 4.) The fact that another physician disagreed with Engleman's assessment is not sufficient to state a constitutional

---

[11] For these same reasons, plaintiff's April 22, 2014, MRI also does not alter the court's conclusion that there is not a constitutional violation. <u>See</u> ((DE 99), Attach.)

claim. See Vanderhart v. Felts, No. 5:10-0492, 2012 WL 727647, * 13 (S.D.W. Va. Feb. 15, 2012);

Thomas v. O'Haver, No. 97-1877, 1998 WL 171270, at * 4 (7th Cir. 1998) ("Physicians will

disagree about whether a particular course of treatment is appropriate, or even if treatment is

appropriate at all, but a disagreement in treatment alone will not support a constitutional violation.").

Additionally, the fact that Engleman's treatment of plaintiff may not have been effective does not

give rise to a constitutional violation. See, e.g., Russell, 528 F.2d at 319; Starling v. United States,

664 F. Supp. 2d 558, 569-70 (D.S.C. 2009); see also, Johnson, 145 F.3d at 167 (finding that negligent

acts are not sufficient to establish a constitutional violation). Thus, plaintiff is unable to establish

an Eighth Amendment violation.

Finally, the court addresses plaintiff's contention that defendant Engleman acted with

deliberate indifference to his carpel tunnel condition. A review of plaintiff's medical records,

however, reveals that plaintiff did not complain about his alleged carpel tunnel condition to

defendant Engleman. Further, as stated, plaintiff was provided near continuous medical treatment

for his varying ailments and was provided several different pain medications to treat his complaints

of pain. Based upon the foregoing, plaintiff is unable to establish that Engleman violated plaintiff's

constitutional rights. Because plaintiff failed to establish a constitutional violation, defendant

Engleman is entitled to qualified immunity for plaintiff's Eighth Amendment claim.[12]

---

[12] To the extent plaintiff alleges any supervisor liability claim based upon the claims in this action, such claim fails because there is no underlying constitutional claim for which any alleged supervisor could be held liable. See Hinkle v. City of Clarksburg, 81 F.3d 416, 420 (4th Cir.1996) ("In the absence of any underlying use of excessive force against Wilson, liability cannot be placed on either the non-shooting officers, a supervisor, or the City.").

## CONCLUSION

For the foregoing reasons, defendants' respective motions for summary judgment (DE 102, 112) are GRANTED. Plaintiff's claims arising in May and August 2012 are DISMISSED without prejudice pursuant to § 1915(e)(2)(B)(ii). The Clerk of Court is DIRECTED to update the caption of this case to reflect the full names of defendants Manning, Borden, Woody, DeMatty, Jacobs, and Stocks. The Clerk also is DIRECTED to close this case.

SO ORDERED, this the 24th day of March, 2015.


_____
LOUISE W. FLANAGAN
United States District Judge